## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DENISE PAINTER ROBERTS,                      )
                                     )
          Plaintiff,               )
                                     )
        v.                        )     Civil Action No. 21-14-CJB
                                     )
KILOLO KIJAKAZI,                             )
Acting Commissioner of Social Security,       )
                                     )
          Defendant.[1]             )

---

Gary Linarducci, LINARDUCCI & BUTLER, PA, New Castle, Delaware, Attorney for Plaintiff.

David C. Weiss, United States Attorney, UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF DELAWARE, Wilmington, DE; Heather Benderson, Special Assistant United States Attorney; Brian O'Donnell, Regional Chief Counsel; Andrew C. Lynch, Assistant Regional Counsel, Office of the General Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, PA, Attorneys for Defendant.

---

## <u>MEMORANDUM OPINION</u>

December 2, 2022
Wilmington, Delaware

---

[1]     Kilolo Kijakazi was sworn in as the Acting Commissioner of Social Security on July 9, 2021.  Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi is substituted for former Commissioner of Social Security Andrew Saul, who was originally named as Defendant in this suit.

*Christopher J. Burke*
**BURKE, United States Magistrate Judge**

Plaintiff Denise Painter Roberts ("Roberts" or "Plaintiff") appeals from a decision of Defendant Kilolo Kijakazi, the Acting Commissioner of Social Security ("the Commissioner" or "Defendant"), denying Roberts' application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA"). *See* 42 U.S.C. §§ 401-33. The Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Roberts and the Commissioner (the "motions"). (D.I. 13; D.I. 15) Roberts asks the Court to vacate the Commissioner's decision and remand to the Commissioner for further proceedings. (D.I. 14 at 20; D.I. 17 at 4) The Commissioner opposes that request and asks that the Court affirm her decision. (D.I. 16 at 10) For the reasons set forth below, Roberts' motion for summary judgment will be GRANTED, the Commissioner's cross-motion for summary judgment will be DENIED and the case will be REMANDED to the Commissioner for further proceedings consistent with this opinion.

## I.     BACKGROUND

### A.     Procedural Background

On August 14, 2018, Roberts applied for DIB; she alleged disability beginning on November 6, 2017. (D.I. 10 (hereinafter "Tr.") at 15, 152, 174) Her claim was initially denied. (*Id.* at 73) Roberts then filed a request for an administrative hearing. (*Id.* at 90-91) On December 17, 2019, a hearing was held before an Administrative Law Judge ("ALJ"), at which Roberts was represented by counsel. (*Id.* at 29-72)

On February 6, 2020, the ALJ issued a decision denying Roberts' request for benefits. (*Id.* at 12-23) Roberts requested review of the ALJ's decision by the Appeals Council, and the

2

Appeals Council later denied Roberts' request for review.  (*Id.* at 1-3)  Thus, the ALJ's decision

became the final decision of the Commissioner.  *See* 20 C.F.R. §§ 404.955 & 404.981; *Sims v.*

*Apfel*, 530 U.S. 103, 106-07 (2000).

On January 7, 2021, Roberts filed a Complaint in this Court seeking judicial review of

the ALJ's decision.  (D.I. 1)  On August 2, 2021, Roberts filed her motion for summary

judgment.  (D.I. 13)  The Commissioner opposed Roberts' motion and filed a cross-motion for

summary judgment on August 31, 2021.  (D.I. 15)  Briefing on the respective motions was

completed on September 17, 2021.  (D.I. 17)  On September 29, 2021, the parties consented to

the Court's jurisdiction to conduct all proceedings in this action, including entry of a final

judgment.  (D.I. 19)

### B.      Factual Background

At the time of the alleged onset of her disability on November 6, 2017, Roberts was 61

years old; at the time of the ALJ's decision in February 2020, she was 63.  (*See* Tr. at 152)

Roberts is a college graduate and, as will be further discussed below, has past work experience as

a senior industrial engineer and a continuous improvement manager.  (*Id.* at 175)

### 1.      Roberts' Mental Health-related Medical History, Treatment, and Condition

Roberts alleges that she has been disabled and unable to work since November 2017 due

to post-traumatic stress disorder ("PTSD"), anxiety and depression.  (*Id.* at 74, 174, 176, 192;

D.I. 14 at 1)  Relevant evidence of record regarding those conditions is set out below.[2]

---

[2]      The Court focuses its summary on the evidence relevant to Roberts' mental
impairments, which are the subject of Roberts' appeal.  In addition to her mental health issues,
Roberts does also suffer from certain physical impairments relating to her hands, ankle and
shoulder, (D.I. 14 at 6; Tr. at 21, 48-49, 552-60, 576, 585), but the Court will not describe those
ailments in greater detail here.

In July 2015, Roberts began treating with her therapist, Laura B. Hummel, DNP, APRN, on a regular basis for panic disorder, generalized anxiety disorder, major depressive disorder, PTSD and attention-deficit hyperactivity disorder ("ADHD").  (Tr. at 326; *see also id.* at 273)  In December 2016, Roberts reported to Ms. Hummel that she had anxiety as her job was "very overwhelming" and she had worked "13 days in a row[,]" and her mother was not doing well. (*Id.* at 272)  She was prescribed duloxetine and alprazolam.  (*Id.* at 273)  In March 2017, Roberts reported that she was "partially improved" following a three-day cruise to the Bahamas.  (*Id.* at 274)  Nevertheless, her anxiety symptoms persisted and work continued to be "very hectic." (*Id.*)  Roberts reported continuing and worsening anxiety symptoms in June and July 2017, and that she was easily distracted and having a tendency to blurt out answers.  (*Id.* at 277, 280)  On June 21, 2017, Roberts was prescribed vyvanse (to take in addition to duloxetine and alprazolam).  (*Id.* at 278)  In October 2017, Roberts appeared sad and near tears; she reported that her mother had just passed away and she also noted that her employer had downsized, which resulted in an increased workload for her.  (*Id.* at 283-84)

From November 7, 2017 (the day after Roberts alleges that her disability began) to September 11, 2019, Roberts visited Ms. Hummel 13 times.  (*Id.* at 286-317, 331-41)  For each of these visits, on examination, Ms. Hummel noted that Roberts was "tearful" or near tears or unhappy, and/or that she had a "[f]acial expression and general demeanor reveal[ing a] depressed mood[,]" and that she exhibited "signs of anxiety" and/or was "easily distracted."  (*Id.* at 287, 290, 293, 296, 300, 303, 306, 309, 312, 316, 332, 336, 340)  That said, in these visits, Roberts was also reported to have displayed intact cognitive functioning and cooperative behavior, to have intact associations, logical thinking, appropriate thought content, and the ability to abstract

and do arithmetic calculations.  (*Id.* at 287, 290, 293, 296, 300, 303, 306, 309, 312, 316, 332, 336, 340)

On November 7, 2017, Roberts reported to Ms. Hummel that "[e]verything has caught up with her" and that she was "overwhelmed" with "extra work, being executor of [her] mom's estate, not taking bereavement days, not eating, not taking time for bathroom breaks."  (*Id.* at 286)  Her feelings of sadness, anxiety and apprehension had worsened; she frequently experienced difficulty concentrating and had episodes of trembling and shaking associated with anxiety.  (*Id.*)  She was making "serious mistakes" at work and was advised to refrain from working for four weeks.  (*Id.*)  On December 5, 2017, Roberts seemed "worse" with more intense and frequent symptoms of generalized anxiety disorder and depression.  (*Id.* at 289)  She reported having panic attacks and nightmares regarding work, as well as symptoms of PTSD. (*Id.*)  During subsequent visits, Roberts regularly reported continuing panic attacks, which would occur when she talked about work or passed her employer's office, as well as nightmares involving work.  (*Id.* at 292, 295, 299, 302, 305, 315)[3]  She also regularly reported continuing symptoms of depression, anxiety, PTSD and/or ADHD.  (*Id.* at 286, 289, 295, 299, 302, 305, 308, 311, 315, 331, 335, 339)

Ms. Hummel's progress notes frequently reflect certain additional health issues that Roberts experienced relating to work.  For example, on December 20, 2017, Roberts reported that when she reviewed her e-mails, her blood pressure would become elevated.  (*Id.* at 292)  On April 11, 2018, Roberts conveyed that she had anger issues regarding returning to work in light of how she had been treated there.  (*Id.* at 305)  On May 10, 2018, she reported that while in

_____

[3]     On September 11, 2019, Roberts reported that the panic attacks had stopped (at least at that time).  (Tr. at 331)

California with her son, he received an e-mail from Outlook (the same e-mail service that her employer used), and this caused her to panic—her face went numb and she became tearful and had an "out of body experience." (*Id.* at 308)  During this visit, Roberts reported that she was denied short-term disability and had received a termination letter as of May 7, 2018. (*Id.*)  An August 1, 2018 progress note reflected that Roberts began to collect unemployment, was "unstable and unimproved[,]" and that the weekly requirement to apply for a job caused her difficulty as it triggered a "reminder[.]" (*Id.* at 311)  An August 21, 2018 message noted that Roberts had called Ms. Hummel's office "very distraught" after receiving a call for a possible job offer that caused her to have a "severe panic attack." (*Id.* at 314)  On October 17, 2018, Roberts reported that she had been "sleeping excessively" and found concentrating "even more difficult." (*Id.* at 315)  On June 19, 2019, Roberts noted that she was starting to have "memories of work issues[.]" (*Id.* at 335)[4]

---

[4]       Roberts also had periodic appointments at Internal Medicine of Dover, where she would occasionally reference her mental health issues.  For example, during a November 7, 2017 visit, Roberts reported that she was experiencing increased stress due to her mother's death in October of that year, and due to taking over her co-worker's job at work. (*Id.* at 365)  On November 16, 2017, Roberts reiterated that she was "under a great deal of stress at work and at home." (*Id.* at 362)  During a December 6, 2017 visit, Roberts noted that she was going on a Caribbean cruise the next day. (*Id.* at 359)  On February 28, 2018, Roberts saw Theresa P. Little, M.D., who described Roberts as a "very active woman" who had a "breakdown" at her job at the end of 2017, and also was dealing with problems with her brother following her mother's death. (*Id.* at 356)  Dr. Little noted that Roberts "feels very stable at this point and is probably going to end up retiring since her husband is 75[—]a lot older than she is and they want to travel around. They will probably get an RV." (*Id.*)  On November 8, 2018, Roberts reported that "they were talking about her retiring but now she's not so sure she wants to do that but she has not been able to go back to work yet." (*Id.* at 353)  During a May 2, 2019 visit, Roberts reported that she had "cut herself out of her depression and anxiety that she had" after her mother's death and that she had decided to "retire completely[.]" (*Id.* at 350)  She was "excited" because she was going to be traveling by car across the western United States, followed by a trip to Iceland and a Danube river cruise. (*Id.*)

A few of Ms. Hummel's treatment notes show indications that Roberts was "slightly improved[,]" (*id.* at 295), or reflect that Roberts reported a lessening of grief symptoms, (*id.* at 302, 339), a slight improvement in concentration, (*id.* at 305), fewer feelings of sadness, (*id.* at 308), less difficulty with sleeping, (*id.* at 339), or a decrease in the frequency and intensity of her PTSD symptoms, (*id.* at 331).  On June 19, 2019, Roberts reported that she had gone on a 2,500 mile driving trip out West.  (*Id.* at 335)  On September 11, 2019, Roberts noted that she and her husband had visited Germany and "had a good time" but that she was "tired."  (*Id.* at 331)

In December 2018, Roberts was referred to Sandra Dryer, LCSW regarding Roberts' anxiety and stress.  (*Id.* at 445)  Roberts treated with Ms. Dryer bi-monthly or weekly as needed through late 2019.  (*Id.* at 319)  Ms. Dryer's November 11, 2019 report (the "November 2019 report") indicated that with respect to Roberts' most recent prior job, she had kept trying to do the work of two people until she was immobilized due to anxiety and panic attacks.  (*Id.* at 445)  Roberts also reported difficulty sleeping and concentrating.  (*Id.*)  Roberts' distress rendered her "incapacitated to function at work."  (*Id.*)  Moreover, the death of Roberts' mother caused an intense sense of loss and a lack of desire to socialize.  (*Id.* at 446)  The November 2019 report reflected that following nearly a year of therapy sessions, Roberts was still having difficulties with panic attacks relating to her past employment, though the frequency and intensity had changed, as Roberts was utilizing tools to try to get through them.  (*Id.* at 447)  Ms. Dryer's November 2019 report also indicated that Roberts was "increasing socialization[.]"  (*Id.*)

## 2.    Reports from Medical Professionals

On December 19, 2018 and January 9, 2019, Ms. Dryer and Ms. Hummel, respectively, each completed a Mental Residual Functional Capacity Statement ("MRFCS") regarding Roberts.  (*Id*. at 319-22, 326-29)  Their opinions therein were similar.  Ms. Dryer assessed

7

Roberts as having acute stress disorder, and Ms. Hummel assessed Roberts as suffering from panic disorder, generalized anxiety disorder, PTSD and major depressive disorder.  (*Id.* at 319, 326)  Both mental health providers answered "yes" to the question asking whether they believed Roberts is "unable to obtain and retain work in a competitive work environment, 8 hours per day, 5 days per week" due to her limitations.  (*Id*. at 322, 329)  By way of further explanation, Ms. Hummel wrote that Roberts has spent more than a year trying to resolve her job-related PTSD and panic issues, but continued to "have renewed, intense reactions and symptoms during the smallest steps to return to the workforce" such as "panic attacks which are crippling in nature[,] chest pain, dizziness, shortness of breath, confusion[,] tearfulness, inability to make decisions, trembling, numbness [and] tingling in extremities."  (*Id.* at 328-29)  Both Ms. Dryer and Ms. Hummel also indicated that as a result of Roberts' physical and mental limitations:  (1) Roberts would be precluded from performing a job in a competitive work environment for more than 30% of an 8-hour work day, 5 days per week; (2) Roberts would likely be absent from work more than 6 days per month; and (3) Roberts would be unable to complete an 8-hour work day, 5 days per week more than 6 days per month.  (*Id.* at 321, 328)  And for most categories listing mental abilities relating to (1) understanding and memory; (2) sustained concentration and memory; and (3) social interaction and adaptation, both Ms. Dryer and Ms. Hummel identified the degree of Roberts' impairment as precluding performance for 15% or more of an 8-hour work day in most areas, including "[m]aintain attention and concentration for extended periods of time[,]" "[m]ake simple work-related decisions" and "[a]ccept instructions and respond appropriately to criticism from supervisors[.]"  (*Id.* at 319-21, 326-28)  In these portions of her report, Ms. Dryer hand-wrote in that all of these types of tasks were "overwhelming" to Roberts. (*Id.* at 320-21)

8

On December 3, 2018, a state agency psychological consultant, Christopher King, PsyD,
completed a Disability Determination Explanation based on his review of Roberts' mental health
treatment records.  (*Id.* at 74-78)  Dr. King noted that Roberts suffers from the severe
impairments of anxiety and depression.  (*Id.* at 75)  He found that Roberts' abilities to interact
with others or with the general public, and her ability to accept instructions and respond
appropriately to criticism from supervisors, were "[m]oderate[ly]" limited.  (*Id.* at 76-77)  Dr.
King also concluded that Roberts' ability to concentrate, persist, or maintain pace was
"[m]ild[ly]" limited and that otherwise, Roberts was not significantly limited with regard to her
mental health or social interaction abilities.  (*Id.*)  He concluded that Roberts "appears capable of
work in a more solitary environment."  (*Id.* at 75; *see also id.* at 77)  In deeming Roberts'
assessment of her own symptoms and functional limitations to be "[p]artially consistent[,]" Dr.
King wrote that the totality of the objective medical evidence did not fully substantiate certain of
Roberts' assertions given that:  (1) Roberts had not been psychiatrically hospitalized; (2) her
cognitive functioning has remained grossly intact over time; and (3) recent follow-up notes from
her treatment provider document "generally intact mental status."  (*Id.* at 76-77)

### 3.    The Administrative Hearing

At the administrative hearing held on December 17, 2019, the ALJ heard Roberts'
testimony and that of Vanessa Ennis, an impartial Vocational Expert ("VE").  (*Id.* at 29-72)

### a.    Roberts' Testimony

At the hearing, Roberts first discussed her work history.  (*Id.* at 34-42)  She explained
that she was most recently employed as a senior industrial engineer at Edgewell Personal Care
("Edgewell") from approximately January 2016 until November 2017.  (*Id.* at 34)  In that role,
Roberts assisted with the labor standards for large machines that had been brought to Edgewell's

Dover, Delaware location from Canada, and she also helped with costing products.  (*Id.* at 34-35)
From 2011 through 2015, Roberts was employed at Tiger Optics and its sister company as a
continuous improvement manager.  (*Id.* at 37, 42)  She "wore a ton of hats there[,]" including
working on their bills of materials and helping with sourcing vendors, working with inventory,
helping with the purchasing department, and working with shipping and receiving.  (*Id.* at 37-38)
Prior to that, from 2000 through 2009, Roberts worked for Mars Fish Care North America as an
industrial engineer.  (*Id.* at 36-37)  In this position, Roberts was mostly on her feet in the factory,
other than times when she would work at her desk on analysis and computer spreadsheets.  (*Id.* at
39)

Questioning then turned to Roberts' mental health and work-related issues.  (*Id.* at 44)
Roberts testified that she was treating with a therapist and was taking medication for anxiety,
ADHD and PTSD.  (*Id.*)  She explained that she has problems with panic attacks and has
flashbacks regarding work when she hears the computer "ding" due to receipt of an Outlook e-
mail.  (*Id.*)

With respect to her most recent position as a senior industrial engineer at Edgewell,
Roberts reiterated that when she was hired, she worked with several brand new machines relating
to sanitary napkins, pads and liners.  (*Id.* at 45)  At that time, the company also employed another
senior industrial engineer who had been there for approximately 10 years; this engineer handled
machines tied to the company's tampon business.  (*Id.*)  Roberts and this other senior industrial
engineer did not work together on projects or understand each other's machines.  (*Id.*)  By mid-
2017, Roberts' mother was in poor health; Roberts had told the company that she would be in
and out of the office as a result.  (*Id.* at 45-46)  But one week before Roberts' mother died,
Edgewell fired the other senior industrial engineer, and Roberts was told that she would be doing

10

all of his work as well as her own work.  (*Id.* at 46)  Roberts felt that this was "nuts" and that it

was impossible for a human to do all of this work, especially because at that time she was also

heavily involved in teaching employees how to use a new computer program to assist with

quality checks.  (*Id.* at 46-47)  During the time period after her mother's death, Roberts had

recurring dreams in which she was dead under her office desk and no one would find her.  (*Id.* at

47)  She was also having difficulties with her brother, who would call and harass her at work.

(*Id.* at 47-48)  In light of all of this, Roberts lasted "for about a month after [her] mom died[,]"

until one day when she had a "full-blown panic attack" at work.  (*Id.* at 47)  During the panic

attack, her chest and head hurt, her lips were numb, and she was screaming and crying and

thought she was dying.  (*Id.*)  Between the death of her mother, the added responsibilities of her

fired co-worker's position, and harassment from her brother, Roberts felt like she was in the

middle of "a perfect storm."  (*Id.* at 47-48)  Roberts testified that it was still hard for her to focus

and concentrate on things.  (*Id.* at 48)

     Roberts next addressed her physical limitations, as well as her daily life at home.  She

explained that she is able to cook and do dishes, sharing responsibilities with her husband.  (*Id.* at

49-50)  Roberts is part of a small group of women that meet weekly to knit, which is a huge

stress reliever for her.  (*Id.* at 50)  She further explained that Ms. Dryer encourages her to get out

in nature, though she often just wished to stay in the house.  (*Id.* at 50-51)

     The ALJ then questioned Roberts regarding her history of travel.  Roberts explained that

traveling and getting away from the area was her "sanity[,]" along with knitting and her cat.  (*Id.*

at 51)  Traveling and seeing new faces helps her to avoid "going into the deep pits of

depression[,]" though she noted that traveling was getting more stressful as it was hard to deal

with airports.  (*Id.* at 51-52)  Roberts referenced various trips that she had taken, including a trip

to the Grand Canyon, a riverboat cruise to Europe, and a Caribbean cruise; she noted that she also had an upcoming trip to Iceland planned with one of her sons and his wife.  (*Id.*)

### b.  Vocational Expert's Testimony

VE Ennis also testified during the hearing.  She explained that she was aware of Roberts' previous jobs.  (*Id.* at 53)  She stated that most of Roberts' work would be considered to be skilled work as an "[i]ndustrial [e]ngineer[;]" these jobs are typically performed at the sedentary level of exertion (though Roberts reported performing them at light and medium levels of exertion) and are listed as Specific Vocational Preparation ("SVP") Level 7 positions.  (*Id.* at 53-54)  Roberts' experience working at Tiger Optics was as a "[q]uality [c]ontrol [m]anager"; it is a skilled position performed at a light level of exertion and listed as an SVP Level 8.  (*Id.* at 54)

Next, the ALJ asked whether there were skills associated with Roberts' prior positions that would be transferrable, to which the VE responded in the negative, noting that Roberts' job and skills were "very specific."  (*Id.*)  Then the ALJ gave the VE a hypothetical:

> [A]ssume an individual who is able to perform light work, frequently climb ramps and stairs, and never climb ladders, ropes or scaffolds, frequently balance, stoop and crouch, occasionally crawl and kneel, who is able to tolerate no more than occasional exposure to vibrations, and no exposure to hazards such as moving machinery or unprotected heights.  Would such an individual be able to perform the claimant's past work?

(*Id*. at 54-55)  The VE considered these limitations and noted that such an individual would not be able to perform Roberts' past work because in that setting, "there is a lot of moving machinery."  (*Id.* at 55)  The ALJ later posed two more hypotheticals, for which she asked the VE to "set[] aside . . . the hazards limitation":

> For the second hypothetical, please assume that the individual could perform work at all exertional levels, and the individual is

12

> able to interact with the public no more than occasionally. Would
> such an individual be able to perform the claimant's past work?
>
> [and]
>
> [P]lease return to the first hypothetical that I asked with all the
> other limitations at the sedentary exertional level. And please
> assume that in addition to those exertional limitations at sedentary,
> the individual also could have no more than occasional interaction
> with the public. . . . Would such an individual be able to perform
> the claimant's past work?

(*Id.* at 55-56, 57) The VE responded that with regard to these hypothetical scenarios, the person

could do Roberts' past job as an industrial engineer, because in these positions she is not

interacting with the public, but instead with people within her own organization. (*Id.* at 55, 58)

The ALJ then posed a final hypothetical:

> [Assume that] the hypothetical individual [was] at the sedentary
> exertional level. . . . Could occasionally climb ramps and stairs,
> never climb ladders, ropes or scaffolds, occasionally balance,
> stoop, kneel, crouch, crawl, tolerate no more than occasional
> exposure to vibrations. . . . And, if the individual could frequently
> finger, handle and reach bilaterally. . . . [i]f the individual could
> frequently interact with supervisors and coworkers, but only
> occasionally work in tandem with others or directly with others,
> and only occasionally interact with the public, would such an
> individual be able to perform the claimant's past work?

(*Id.* at 60) The VE first responded that yes, such an individual would be able to perform

Roberts' past work as it is generally performed, and as Roberts actually performed it. (*Id.* at 60,

62) She then explained that with respect to interaction in the industrial engineer position, it is

both a "group effort" and an "individual effort"; the employee must "put all [of the] information

together" but must also "work around other people as far as going on the line to find out exactly

how they're doing things and then analyzing what's working and what's not working. So you do

. . . have to be" in "frequent" "collaboration with other people." (*Id.* at 66-67) The VE then

13

seemed to say that if the relevant "limitation was occasionally working" in collaboration with others, then the person would *not* be able to do Roberts' past work.  (*Id.* at 68)[5]  She concluded by confirming that her testimony was "consistent with the *Dictionary of Occupational Titles*" and that she also "incorporated collaboration[.]"  (*Id.* at 69-70 (emphasis in original))

### 4.    The ALJ's Findings

On February 6, 2020, the ALJ issued the decision, which included the following seven findings:

> 1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2022.
>
> 2.  The claimant has not engaged in substantial gainful activity since November 6, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*). . . .
>
> 3.  The claimant has the following severe impairments:  bilateral carpal tunnel syndrome, degenerative joint disease of right AC, and right hand status-post breakage (20 CFR 404.1520(c)). . . .
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526). . . .
>
> 5.  After careful consideration of the entire record, the [ALJ] finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can frequently climb ramps and stairs and occasionally climb ladders, ropes, and scaffolds; she can frequently balance, stoop, and crouch and occasionally kneel and crawl; she can tolerate occasional exposure to extreme cold, extreme heat, humidity, noise, vibrations, fumes, odors, dusts, gases, poor ventilation, and hazards

---

[5]    This portion of the hearing transcript is a bit difficult to decipher.  In part that is due to the number of different hypotheticals that were posed to the VE and because of the different answers that the VE provided to those hypotheticals.  In part it is also due to the fact that during this portion of the hearing, it appears that the ALJ, the VE, Roberts' attorney and/or Roberts were occasionally speaking at the same time.  (Tr. at 59-69)

such as moving machinery or unprotected heights; and she can
frequently finger, handle, and reach. . . .

6.  The claimant is capable of performing past relevant work as an
industrial engineer.  This work does not require the performance of
work-related activities precluded by the claimant's residual
functional capacity (20 CFR 404.1565). . . .

7.  The claimant has not been under a disability, as defined in the
Social Security Act, from November 6, 2017, through the date of
this decision (20 CFR 404.1520(f)).

(*Id.* at 17-23 (emphasis omitted))  The relevant additional content of the ALJ's decision will be

discussed in greater detail below.

## II.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56.  "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  In determining the appropriateness of summary judgment, the Court

must "review the record as a whole, 'draw[ing] all reasonable inferences in favor of the non-

moving party' but not weighing the evidence or making credibility determinations."  *Hill v. City

of Scranton*, 411 F.3d 118, 124-25 (3d Cir. 2005) (alteration in original) (quoting *Reeves v.

Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

### B.    Review of the ALJ's Findings

The Court must uphold the Commissioner's factual findings if they are supported by

"substantial evidence[.]"  *See* 42 U.S.C. § 405(g); *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir.

2000).  "Substantial evidence" may be less than a preponderance of the evidence but must be

more than a mere scintilla of evidence; it is "such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion[.]" *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) (internal quotation marks and citation omitted).  In analyzing whether substantial evidence supports the Commissioner's factual findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record.  *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986).  Even if the reviewing Court would have decided the factual inquiry differently, it must defer to the ALJ and affirm the Commissioner's decision, so long as the decision is supported by substantial evidence.  *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Monsour*, 806 F.2d at 1190-91.

In addition to conducting an inquiry into whether substantial evidence supports the ALJ's determination, the Court must also review the ALJ's decision to determine whether the correct legal standards were applied.  *Bierley v. Barnhart*, 188 F. App'x 117, 119 (3d Cir. 2006).  The Court's review of legal issues is plenary.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000).

## III.   DISCUSSION

In resolving the instant motions, the Court will first summarize the relevant law regarding the disability determination process.  It will then go on to assess Roberts' arguments on appeal.

### A.   Disability Determination Process

Title II of the SSA "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability."  *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).  To qualify for DIB benefits, the claimant must establish that he or she was disabled prior to the date last insured.  20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990).  A "disability" is defined for purposes of DIB as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

16

expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. § 423(d)(1)(A); *see also Tate v. Berryhill*, C.A. No. 15-604-LPS, 2017 WL 1164525, at *5 (D. Del. Mar. 28, 2017).  A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]"  42 U.S.C. § 423(d)(2)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 21-22 (2003); *Tate*, 2017 WL 1164525, at *5.

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis.  *See* 20 C.F.R § 404.1520; *see also Russo v. Astrue*, 421 F. App'x 184, 188 (3d Cir. 2011).  If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further.  *See* 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i) (mandating a finding of non-disability when claimant is engaged in substantial gainful activity).  If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. 20 C.F.R. § 404.1520(a)(4)(ii) (mandating a finding of non-disability when claimant's impairments are not severe).  If the claimant's impairments are severe, then the Commissioner proceeds to step three and must compare the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work.  20 C.F.R. § 404.1520(a)(4)(iii); *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).  When a claimant's impairment meets or equals an impairment in the listings, the claimant is presumed disabled.  *See*

17

20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment fails to meet or medically equal any

listing, the Commissioner should proceed to steps four and five.  20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual

functional capacity (or "RFC") to perform his or her past relevant work.  20 C.F.R. §

404.1520(a)(4)(iv) (stating that a claimant is not disabled if he or she is able to return to past

relevant work); *Plummer*, 186 F.3d at 428.  A claimant's RFC is "that which an individual is still

able to do despite the limitations caused by his or her impairment(s)."  *Johnson v. Comm'r of

Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008) (internal quotation marks and citation omitted).

"The claimant bears the burden of demonstrating an inability to return to her past relevant work."

*Plummer*, 186 F.3d at 428.

If the claimant is unable to return to his or her past relevant work, step five requires the

Commissioner to determine whether the claimant's impairments preclude him or her from

adjusting to any other available work.  20 C.F.R. § 404.1520(a)(4)(v) & (g) (mandating a finding

of non-disability when the claimant can adjust to other work and a finding of disability when the

claimant cannot do so); *Plummer*, 186 F.3d at 428.  At this last step, the burden of production is

on the Commissioner to show that the claimant is capable of performing other available work

before denying disability benefits.  *Plummer*, 186 F.3d at 428.  In other words, the ALJ must

show that "there are other jobs existing in significant numbers in the national economy which the

claimant can perform, consistent with her medical impairments, age, education, past work

experience, and [RFC]."  *Id.*  When making this determination, the ALJ must analyze the

cumulative effect of all of the claimant's impairments.  *Id.*  At this step, the ALJ often seeks the

assistance of a VE (as the ALJ did here).  *Id.*

**B.     Roberts' Arguments on Appeal**

18

On appeal, Roberts takes issue with the ALJ's RFC determination at step four, which did not include any mental health-related limitations.  (D.I. 14 at 1, 9-20)  Specifically, Roberts contends that the RFC determination was not supported by substantial evidence because:  (1) the ALJ improperly rejected the medical opinion evidence, which indicated that there were significant limitations in Roberts' mental functioning capacity; and (2) the RFC disregards the ALJ's own findings indicating that Roberts did, in fact, suffer from at least "mild" mental health-related limitations.  (*Id.* at 9-20; D.I. 17 at 2-4)  For the reasons discussed below, the Court concludes that Roberts' first argument—i.e., that the ALJ's errors in assessing the medical opinion evidence when formulating the RFC require reversal—is well taken (and that the Court therefore need not address Roberts' second argument).  *See, e.g.*, *Hand v. Kijakazi*, CIVIL ACTION NO. 3:21-CV-00617, 2022 WL 3701625, at *8 (M.D. Pa. Aug. 26, 2022) (concluding that the ALJ's decision must be vacated based on his failure to consider certain impairments and declining to address the plaintiff's remaining arguments, which could be futile "given that the ALJ's reconsideration of the RFC may yield a different result").

An RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996); *Ford v. Colvin*, C.A. No.: 1:14-CV-01046-RGA, 2015 WL 4608136, at *7 (D. Del. July 31, 2015).  A claimant's RFC measures the *most* that the claimant can do despite her mental and physical limitations.  *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014); *see also* 20 C.F.R. § 404.1545(a)(1).  The ALJ is required to formulate the claimant's RFC based on "all of the relevant medical and other evidence."  20 C.F.R. § 404.1545(a)(3).

19

Because the claim at issue here was filed after March 27, 2017, the ALJ did not need to defer to or give any specific evidentiary weight (including controlling weight) to any medical opinion, including opinions from Roberts' medical sources like Ms. Dryer or Ms. Hummel.  *See* 20 C.F.R § 404.1520c; *see also Jones v. Kijakazi*, Civil Action No. 20-1074-SRF, 2022 WL 1016610, at *8 (D. Del. Apr. 5, 2022).  Instead, the ALJ must consider the persuasiveness of all medical opinions and prior administrative medical findings[6] based on the application of five factors:  (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1520c(c); *Weidner v. Kijakazi*, Civil Action No. 20-1250-MN, 2022 WL 610702, at *11 (D. Del. Feb. 1, 2022), *report and recommendation adopted*, 2022 WL 610678 (D. Del. Feb. 16, 2022).  "The ALJ must explain how [s]he considered the most important factors of supportability and consistency."  *Weidner*, 2022 WL 610702, at *11 (citing 20 C.F.R. § 404.1520c(b)(2)).  "Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion."  *Id*. (internal quotation marks and citation omitted).

Here, all opinions of record—the medical opinions of Ms. Dryer and Ms. Hummel, as well as Dr. King's prior administrative medical finding—determined that Roberts had certain limitations in her mental functioning capacity.  All three opined that Roberts was limited in her ability to interact with others.  (Tr. at 76-77, 320-21, 327)  And all three opined that Roberts had

---

[6]     The regulations define "finding[s] . . . about a medical issue made by [the Commissioner's] Federal and State agency medical and psychological consultants at a prior level of review . . . based on their review of the evidence in [the claimant's] case record" as "prior administrative medical finding[s]."  20 C.F.R. § 404.1513(a)(5).

a limitation in concentration, persisting and maintaining pace.  (*Id.* at 76, 320, 327)  The Court again briefly summarizes these providers' conclusions—and the ALJ's assessment of those conclusions—below.

Ms. Dryer determined that Roberts was a "Category IV" (the highest listed level of infirmity, which precludes performance of a task for 15% or more of an 8-hour work day) with respect to nearly every possible mental ability referenced on the MRFCS.  (*Id.* at 320-21)  These severe limitations related to areas such as the ability to interact with others and accept criticism from supervisors, the ability to maintain concentration, the ability to sustain an ordinary routine without special supervision, and the ability to perform at a consistence pace.  (*Id.*)  However, in her decision, the ALJ concluded that Ms. Dryer's opinion was not persuasive.  This was because: (1) Ms. Dryer based these limitations, in part, on Roberts' subjective statements regarding her own limitations; and (2) those limitations are not supported by the record.  (*Id.* at 22)  With respect to the record, the ALJ pointed to the fact that Roberts' examinations showed "intact cognitive functioning, cooperative and appropriate behavior, and ability to abstract and do arithmetic calculations[,]" as well as the fact that Roberts had the ability to travel frequently and mostly abroad.  (*Id.*)  The ALJ noted that notwithstanding Roberts' "impairments or any abnormalities seen on mental status exam . . . . [Roberts'] ability to travel to such a degree does not suggest severe mental impairment."  (*Id.*)

As for Ms. Hummel, she concluded that Roberts was similarly limited—i.e., that Roberts was a Category IV and had severe limitations regarding nearly every mental ability listed on the MRFCS.  (*Id.* at 327-28)  Ms. Hummel noted that Roberts continued to have "renewed, intense" symptoms when engaging in the "smallest steps to return to the workforce[,]" such as job interviews.  (*Id.* at 329)  The ALJ, however, wrote in her decision that she "does not find Ms.

Hummel's opinion supported by her explanation, which focuses on the claimant's increased symptoms and decompensation when work[-]related activities arise[.]" (*Id.* at 22)  The ALJ further stated that Ms. Hummel's opinion was inconsistent with the record, for the same reasons as described above with respect to Ms. Dryer's opinion. (*Id.* at 22-23)

Lastly, with regard to Dr. King, he concluded that Roberts had moderate limitations when it came to: (1) interaction with others/the general public; and (2) the ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.* at 76-77)  In support of this determination, Dr. King noted Roberts' "history of anxiety symptoms and problematic relationships[.]" (*Id.* at 77)  Dr. King further found that Roberts' impairments "impact her ability to concentrate[,]" such that she was mildly limited with respect to concentration, persistence, and maintaining pace. (*Id.* at 75-76)  The ALJ, in turn, found that the portion of Dr. King's opinion regarding Roberts' social interaction limitations was "not persuasive" because: (1) it was "not well supported by [Dr. King's] explanation, which seems to focus on the claimant's having residual anxiety symptoms"; and (2) it was "inconsistent [with Roberts'] activities of daily living[,]" in that Roberts had been able to travel frequently and participate in a weekly knitting group. (*Id.* at 22)  However, the ALJ found the remainder of Dr. King's opinion to be persuasive and well-supported, in light of Roberts' generally "intact cognitive functioning and behavior on exam, no reported problems with personal care, and generally favorable response to treatment [in that Roberts reported] feeling stable and [had the] ability to travel often and mostly abroad." (*Id.*)

Having set out the relevant record, the Court now turns to the merits of Roberts' argument.  Roberts asserts that the ALJ's dismissal of Ms. Hummel's and Ms. Dryer's

opinions—as well as certain portions of Dr. King's opinion—in formulating the RFC was not supported by substantial evidence.

The Court agrees with Roberts that the ALJ's reasons for rejecting the medical opinions of Ms. Dryer and Ms. Hummel (and certain portions of Dr. King's opinion) at step four— whether assessed individually or taken together—amount to reversable error.  There are at least four problems with the ALJ's decision in this regard.

First, in rejecting the opinions of Ms. Dryer and Ms. Hummel, the ALJ utilized the providers' treatment notes in a manner that ignored how "the work environment is completely different from home or a mental health clinic[.]"  *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000).  In coming to her RFC decision, the ALJ significantly relied on the fact that during Roberts' therapeutic examinations, Roberts exhibited certain positive mental health-related traits—i.e., she showed "intact cognitive functioning, cooperative and appropriate behavior and [the] ability to abstract and do arithmetic calculations[.]"  (Tr. at 22-23)  But the ALJ failed to explain why these observations about Roberts' behavior and math skills, as exhibited in a therapist's office, suggest that Roberts had the ability to handle the stresses of her *past workplace*.  (D.I. 14 at 14; D.I. 17 at 3-4)  Such an explanation is warranted here, where Ms. Dryer and Ms. Hummel both opined that Roberts' mental health issues are *largely related to work*.  (Tr. at 329, 447; *see also* D.I. 14 at 15)[7]  It is typically improper for an ALJ to supplant a

_____

[7]        To be more specific, as stated above, the ALJ noted that Roberts exhibited "intact cognitive functioning, cooperative and appropriate behavior and [the] ability to abstract and do arithmetic calculations" during therapy sessions with Ms. Dryer and Ms. Hummel.  (Tr. at 22-23)  But Ms. Dryer and Ms. Hummel had repeatedly concluded that, when it came to functioning in a *work setting*, Roberts had an "overwhelming" inability to exhibit appropriate behavior or to make use of her memory or concentration abilities, (*id*. at 320), and that any improvement that Roberts had exhibited "decompensates when any work[-]related activities arise" because her work caused her panic attacks, the inability to make decisions and various harmful physical

provider's opinion about a claimant's ability to function in the workplace with "an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting." *Morales*, 225 F.3d at 319; *see also Brownawell v. Comm'r of Social Sec.*, 554 F.3d 352, 356 (3d Cir. 2008) (concluding that an ALJ wrongfully discredited a treating physician's findings as to the claimant's inability to maintain attention or concentration in the workplace; while the ALJ relied upon the fact that a treatment note cited the claimant's "good focus, good attention, and good concentration[,]" this was inappropriate, as "this Court has admonished ALJs who have used such reasoning, noting the distinction between a doctor's notes for purposes of treatment and that doctor's ultimate opinion on the claimant's ability to work"); *Bazewicz v. Kijakazi*, CIVIL ACTION NO. 3:21-cv-00504, 2022 WL 4357480, at *7 (M.D. Pa. Sept. 20, 2022) (finding that the "ALJ's mention of the plaintiff having some normal mental status upon examination[,]" *inter alia*, did not constitute substantial evidence to justify the ALJ's rejection of marked and extreme limitations in the medical opinions, as "[e]vidence of a plaintiff's behavior and abilities at home or during medical appointments is considered poor evidence of a plaintiff's abilities and behaviors under the stress of the workplace"); *Copes v. Berryhill*, CIVIL ACTION NO. 16-5735, 2019 WL 1455443, at *4 (E.D. Pa. Apr. 1, 2019).

Second, and relatedly, although the ALJ cited to the above-referenced positive therapeutic findings described in Ms. Dryer's and Ms. Hummel's treatment notes, the ALJ failed to substantively discuss the many *negative* clinical observations found in those same records.

---

symptoms, (*id*. at 328-29).  Pursuant to the applicable precedent set out herein, the ALJ would have at least needed to explain why she concluded that certain positive behaviors that Roberts exhibited in a *therapeutic setting* would have been likely to carry over to a *work setting*— especially in light of Ms. Dryer's and Ms. Hummel's emphatic conclusions to the contrary.

Ms. Dryer's and Ms. Hummel's opinions regarding Roberts' mental RFC were based on, *inter alia*, their regular treatment of Roberts (Ms. Dryer for nearly a year and Ms. Hummel for many years).  (Tr. at 322, 329)  Ms. Dryer's November 2019 report notes that after the use of a clinical interview and screening tools, Roberts exhibited specific symptoms of anxiety, PTSD and grief and loss.  (*Id.* at 445-46)  Similarly, Ms. Hummel's notes consistently reflect that, upon examination, Roberts was experiencing many abnormalities in terms of her ability to interact appropriately and think clearly, such as crying or near crying, distractedness, extreme anxiety and depression.  (*Id.* at 287, 290, 293, 296, 300, 303, 306, 309, 312, 316, 331-32, 336, 340)  Yet in her decision, other than vaguely noting that there were "abnormalities seen on [Roberts'] mental status exam[,]" the ALJ never really confronted or discussed any of these negative clinical findings in detail.  (*Id.* at 22-23)  An ALJ must consider *all* relevant evidence—including "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others"—when crafting an RFC.  *Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001).  In failing to substantively engage with the above-referenced negative clinical observations and findings, the ALJ rendered it unclear whether she considered any such evidence when determining Roberts' RFC (and if so, why she discounted it).  This is another reason why the ALJ erred in her RFC determination process.  *See Blackman v. Kijakazi*, — F. Supp. 3d —, 2022 WL 2791746, at *13 (E.D. Pa. July 15, 2022) (explaining that a "failure to discuss negative findings, while relying upon positive findings, is a classic 'cherry pick,' and an inappropriate basis upon which to wholesale reject a medical opinion[,]" and noting that the ALJ's "failure to grapple with evidence that contradicts the ALJ's findings leaves [the Court] unable to perform a

meaningful review of the ALJ's decision."); *see also Maximiliano L. v. Kijakazi*, Case No. 3:21-cv-0083, 2022 WL 4550631, at *8 (D.N.J. Sept. 29, 2022) (same).

Third, the ALJ failed to sufficiently explain how the fact that Roberts was able to travel often (including abroad)[8] was indicative of her ability to do her past relevant work, or why it otherwise means that Roberts did not have any mental-health-related limitations impacting her RFC.  (D.I. 14 at 15; D.I. 17 at 3)  Ms. Dryer encouraged Roberts to socialize and get out of the house, and Roberts described traveling and getting away from her environment as her "sanity." (Tr. at 50-51, 446-47)  And Ms. Hummel's treatment notes reflect an awareness that Roberts enjoyed travel, (*see id.* at 274, 308, 331, 335, 339), yet Ms. Hummel nevertheless opined that Roberts' mental limitations left her unable to work in a competitive work environment, (*id.* at 327-29).  Further, in certain of the records, Ms. Hummel noted that after returning from travel, Roberts continued to experience anxiety and depression.  (*Id.* at 331, 335)  While the Court does not mean to suggest that a claimant's ability to engage in certain social activities (like travel) is irrelevant to an ALJ's RFC determination,[9] the ALJ should provide some explanation as to *how or why* such an ability "support[s] a conclusion that [the claimant] could therefore handle the rigors of 40-hour per week employment."  *See Blackman*, 2022 WL 2791746, at *17; *Davis v. Kijakazi*, CIVIL ACTION NO. 20-cv-04867-RAL, 2022 WL 1460356, at *7 (E.D. Pa. May 9,

---

[8]        Roberts did travel quite a lot—and to some fairly far-flung locales—during the years in question.  (D.I. 16 at 8-9)  As was noted previously, these trips included a cruise to the Caribbean in December 2017, travel across the western United States in May 2019, (Tr. at 51-52, 339, 350), a Danube river cruise in August 2019, (*id.* at 343, 350, 352), and a trip to Iceland in December 2019, (*id.* at 51-52, 339).

[9]        Indeed, it is "appropriate for an ALJ to consider the number and type of activities in which a claimant engages when assessing his or her [RFC]."  *Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 118 (3d Cir. 2012).

2022) (assessing the ALJ's conclusion that a consultative psychologist's opinion was erroneous, where the psychologist found that the claimant had limitations in her ability to interact appropriately with supervisors and to respond appropriately to work situations or to changes in routine work settings; the court determined that the ALJ's decision was in error, because "the ALJ presented no analysis concerning whether [the claimant's] engagement in [certain] daily activities [like shopping or walking her dog] indeed indicates that she can perform effectively in a work environment"); *see also Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity. . . . It is well established that sporadic or transitory activity does not disprove disability.").[10]  The failure to do so amounted to error here.

Fourth, in determining that Roberts had only a "mild" limitation in terms of interacting with others, the ALJ erred in rejecting all three medical opinions of record to the contrary.  (D.I. 14 at 10, 17)  As described above, Dr. King found that Roberts had "[m]oderate[]" limitations with regard to interacting with others at work, and Ms. Dryer and Ms. Hummel concluded that Roberts had quite severe limitations in this area.  (Tr. at 22, 76-77, 320-21, 327-28)  In supporting her conclusion that Roberts had only a "mild" limitation in this regard, the ALJ pointed to Roberts' frequent travel, to her participation in a weekly knitting group, and to the

---

[10]     The Court notes that it could be (depending on circumstances of a particular case) that if a person can successfully travel to and from a distant foreign country, then the mental health-related skills that enabled the person to do so are the kinds of skills that would also allow the person to handle the mental rigors of their past workplace.  But the Court's point here is that if an ALJ concludes that this is so in a particular case, then in order for that conclusion to be effectively reviewed, the ALJ would have to provide more details than the Court has here.  What types of skills did the person actually utilize on her trips abroad?  How could those skills translate to the person's prior workplace?  Here, the ALJ's conclusion on this point is devoid of such details.

type of selective findings at Roberts' therapy appointments previously described above.  (*Id.* at 18)  However, an ALJ may reject a medical opinion "only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317-18 (explaining that "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability"); *Bazewicz*, 2022 WL 4357480, at *6 (explaining that an ALJ "is only permitted to disregard the treating physician's opinion (here, that the plaintiff had a marked limitation in remembering and applying information), when the treating physician's opinion is inconsistent with other substantial evidence" as an "ALJ's lay interpretation of the medical evidence is not inconsistent substantial evidence"); *see also, e.g.*, *Simpson v. Kijakazi*, CIVIL NO.: 1-20-CV-00275, 2021 WL 3869942, at *9-11 (M.D. Pa. Aug. 27, 2021) (concluding that it is error for an ALJ to reject medical opinion evidence in reliance on the ALJ's own lay opinion even under the new medical opinion regulations); *Kenyon v. Saul*, Civil No. 1:20-CV-1372, 2021 WL 2015067, at *9 (M.D. Pa. May 19, 2021) (same).  Here, the ALJ rejected the opinions of every medical professional of record on this point based on her lay opinion, which is error.

In sum, for the reasons described above, the Court cannot conclude that the ALJ's RFC determination is supported by substantial evidence.  On remand, the ALJ should consider all of the relevant, probative evidence in the record and provide a sufficient explanation in support of her RFC determination.  *See, e.g.*, *Siderias v. Kijakazi*, CIVIL ACTION No. 21-305, 2022 WL 4368491, at *8 (E.D. Pa. Sept. 20, 2022).

## IV.   CONCLUSION

For the reasons set forth in this Memorandum Opinion, Roberts' motion for summary judgment is GRANTED and the Commissioner's cross-motion for summary judgment is

DENIED.  The case is REMANDED for further proceedings consistent with this opinion.  An

appropriate Order will issue.